UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| VIOLET ORTEGA, | CV-15-3043-FVS |
| Plaintiff, | |
| v. | **ORDER AFFIRMING THE** |
| | **DECISION OF THE** |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | **ADMINISTRATIVE LAW JUDGE** |
| Defendant. | |

    **AN ADMINISTRATIVE LAW JUDGE** denied Violet Ortega's claim for Title

XVI supplemental security income.  42 U.S.C. § 1381-1383f; 20 C.F.R., Part 416.

After exhausting the remedies offered by the Social Security Administration, Ms.

Ortega filed the instant action.  The matter comes before the Court based upon

the parties' cross motions for summary judgment.  Ms. Ortega is represented by

D. James Tree.  The Acting Commissioner is represented by John C. Lamont.  For

the reasons set forth below, the decision of the Administrative Law Judge is

affirmed.

**BACKGROUND**

Violet Ortega was born on December 15, 1987. (TR 265.) Her parents abused alcohol and drugs; divorcing when she was six years old. (TR 266.) She stayed with her mother, who was more interested in partying than in raising a daughter. As a result, the little girl was neglected and victimized. *Id.* On at least one occasion, the perpetrator was charged with a crime. Ms. Ortega reports her mother sided with the man rather than with her. *Id.* Afterward, Ms. Ortega left her mother's home. She lived with relatives and foster families, never staying in one place for very long. *Id.* By the time she was 18, she was pregnant. *Id.* She married the child's father, but the marriage ended in divorce. *Id.*

School would have been difficult even if Ms. Ortega had grown up in a stable home. (TR 58.) As it was, given the absence of parental guidance, she often failed to attend. (TR 266.) She says she missed over one half of the second grade. (TR 266.) She was placed in special education classes during her elementary years and, later, encouraged to transfer to an alternative school. (TR 58.) The change was counterproductive. She says she "started [hanging] out with the wrong crowd." *Id.* She made it to the tenth grade and then dropped out. *Id.* To her credit, she has not completely given up. She has passed at least

two of the General Educational Development tests, and, if circumstances permit, she would like to press on and obtain a diploma.  (TR 55.)

**CHRONOLOGY OF EVENTS**

A number of events occurred between 2009 and 2013 that are relevant to Ms. Ortega's claim for supplemental security income.  The following is a partial chronology:

**January 27, 2009**:  Jolene Nell, a licensed clinical social worker, performed a mental health assessment.  (TR 265.)  Ms. Ortega recounted the abuse she suffered as a child.  (TR 266.)  In addition, she described her use of drugs and alcohol.  She smoked marijuana and drank extensively between the ages of 13 and 16.  Id.  At age 16, after consuming two controlled substances, she jumped off of a building, believing she could fly.  Id.  She reported that, thereafter, she cut back on drinking.  She told Ms. Nell she "now has one drink at most 2-3 times per year."  *Id.*

**April 6, 2009**:  Abdul Qadir, M.D., conducted a psychiatric evaluation. During the evaluation, he sought to find out whether she has a history of substance abuse.  Ms. Ortega told him she drinks "very little," "used marijuana when she was young," and only used cocaine "once."  (TR 262.)  Dr. Qadir diagnosed Attention Deficit Disorder and Depressive Disorder.  He prescribed an antidepressant "to help with her mood problems," and he asked her to come

Order ~ 3

back in six weeks.  (TR 263.)  It is unclear whether she returned to Dr. Qadir during the spring or summer of 2009.

**June 24, 2009**:  Ms. Ortega went to the Yakima Indian Health Center complaining of forgetfulness, fatigue, numbness, and dizziness.  (TR 258.)  It does not appear she was taking an antidepressant at that time.  (TR 258-261.)

**August 18, 2009**:  Ms. Ortega obtained a physical examination so she could work as a flagger.  (TR 254.)  By this point, she was taking a medication for bipolar disorder.  *Id.*

**Summer of 2009**:  Ms. Ortega worked as a flagger for approximately three months.  (TR 204.)  She says she continually missed work because of depression. (TR 59.)  She says that, eventually, her employer became frustrated by her absences and fired her.  *Id.*

**December 3, 2009**:  Ms. Ortega filed a claim for Title XVI supplemental security income ("SSI").  42 U.S.C. § 1381-1383f; 20 C.F.R., Part 416.  (TR 22.)

**January 28, 2010**:  At the request of the Washington Department of Social and Health Services, Dr. Qadir completed a form that is entitled "Documentation Request for Medical/Disability Condition."  He wrote that, at the time, Ms. Ortega suffered from a condition that rendered her "unable to participate" in the workforce.  (TR 531.)  He indicated that her condition was "a permanent

Order ~ 4

condition," but "[w]e will reassess in 6 months if her condition gets better." *Id.* at 532.

**March 15, 2010**:  The Social Security Administration denied Ms. Ortega's 2009 claim for SSI benefits.  She did not challenge the SSA's decision.  *Id.*

**April 1, 2010**:  Jolene Nell, the licensed clinical social worker, met with Ms. Ortega in order to assess her response to the medications she was taking. (TR 330.)  Ms. Ortega said she was continuously depressed.  (TR 330.)  More often than not, said Ms. Ortega, the depression was "10+" on a scale of 0-10.  *Id.* Ms. Ortega indicated she was drinking from 44 to 88 fluid ounces of caffeinated soda each day.  On top of that, she said she had an occasional energy drink.  (TR 330.)  Ms. Nell advised Ms. Ortega of the adverse effects of consuming such large quantities of caffeine and sugar.  *Id.*  Ms. Nell asked Ms. Ortega to return for additional counseling.  Ms. Nell also referred her to Dr. Qadir.

**April 7, 2010**:  Ms. Ortega told Ms. Nell she continued to suffer from severe depression.  (TR 332.)

**April 22, 2010**:  Ms. Ortega met with Dr. Qadir so he could assess the effectiveness of the medications he had prescribed.  Ms. Ortega reported "mood swings" and "increased irritability."  (TR 336-37.)  Dr. Qadir commented, "I am going to increase Depakote to target her mood swings.  I will add Ritalin to help with her ADHD. . . .  Patient is not on anti-depressant as it seems she does not

Order ~ 5

get good results from antidepressants.  I am targeting her mood swings and ADHD at this time as it seems her depression is under fairly good control." *Id.*

**July 22, 2010**:  Dr. Qadir assessed Ms. Ortega's response to the medications he had prescribed.  He wrote, "She is doing much better with this combination of [medications].  She still has some anger, but it's manageable.  She is eating and sleeping well.  Her concentration is pretty decent with Ritalin.  Energy levels are stable. . . .  She rarely drinks alcohol.  She does not use any street drugs." (TR 364.)

**April of 2011**:  Ms. Ortega joined the Job Corps, but she was unable to complete the program as a result of a flare-up of her mental health problems.  (TR 220, 534.)

**May 4, 2011**:  Chris Clark, a licensed mental health counselor, completed a "Psychological/Psychiatric Evaluation" at the request of the Washington State Department of Social and Health Services."  (TR 379.)  He observed symptoms of anxiety and depression, which he thought would have a marked impact upon her ability to work.  (TR 380.)  He concluded his assessment with the following remarks, "Ms. Ortega has a history of treatment for chronic mood problems, based on past trauma issues.  She also has attention and concentration problems that have been treated fairly effectively with pharmacotherapy.  She needs to

resume supportive psychiatric treatment, in order to return to her baseline of functioning around October 2010." (TR 382.)

**May 18, 2011**:  Ms. Ortega filed another claim for SSI benefits.  (TR 22.) She alleged disability began on November 8, 2009.  *Id.*

**July 6, 2011**:  Ms. Ortega met with Lori A. Drews, an Advanced Registered Nurse Practitioner.  (TR 386.)  ARNP Drews wrote, "Client reports symptoms are well controlled with medications.  Client denies suicidal thoughts[;] denies substance use." *Id.*

**August 3, 2011**:  Ms. Ortega was examined by Chet LumOr, an Advanced Registered Nurse Practitioner.  She denied using alcohol, but admitted to ARNP LumOr she was consuming a large quantity of caffeine and sugar each day.  (TR 415.)  He determined she was experiencing "the symptoms of a major depressive episode." (TR 414.)  Ms. Ortega said she was taking Depakote, but that she wanted to try a different medication.  Id.  ARNP LumOr issued a prescription for the requested medication and referred her to a mental health professional for therapy.  (TR 416.)

**August 9, 2011**:  Ms. Ortega was examined by Jody B. Gray, an Advanced Registered Nurse Practitioner.  She advised ARNP Gray that the medication ARNP LumOr had prescribed the week before improved her mood (TR 412), but it also caused a rash.  (TR 410-11.)  Ms. Ortega said she took Benydryl and the

Order ~ 7

rash disappeared.  (TR 411.)  ARNP Gray noted Ms. Ortega was "not anxious, denies hallucinations, has no mood swings, and does not have suicidal ideation." (TR 412.)  ARNP Gray advised Ms. Ortega to continue taking the medication, but that if the rash returned, she should discontinue its use and seek medical care. *Id.*

**August 31, 2011**:  Ms. Ortega returned to ARNP LumOr for a follow-up examination.  He determined her bipolar condition had improved in response to the new medication, and he recommended increasing the dose.  (TR 409.)  Ms. Ortega agreed.  *Id.*

**September 13, 2011**:  The Social Security Administration denied Ms. Ortega's 2011 claim for SSI benefits.  The SSA's decision was based, in large part, upon the analysis of Eugene Kester, M.D.  (TR 78.)  Dr. Kester acknowledged Ms. Ortega suffers from severe mental impairments.  (TR 73.)  He also acknowledged her impairments reasonably can be expected to cause the symptoms she alleges. (TR 74.)  However, he decided her description of her symptoms was only "[p]artially credible."  (TR 74.)  Ultimately, he decided a significant number of jobs presently exists in the national economy that she is capable of performing. (TR 78.)

**September 15, 2011**:  Ms. Ortega met with Laurie L. Jones, MSW.  (TR 401.)  In connection with the appointment, Ms. Ortega completed a "Patient

Order ~ 8

Health Questionnaire." (TR 525.)  Her responses indicated she was doing well. Id.  Ms. Jones noted, "Patient reports that since taking the new medication she is experiencing no symptoms and is not in need of counseling." (TR 401.)

**Fall of 2011**:  During the fall of 2011, she made another attempt to work; finding a job at the local fairgrounds. (TR 60.) She says the first day went reasonably well, but on the second day, she had an anxiety attack, which was the end of the job. (TR 60-61.)

**September 28, 2011**:  Ms. Ortega returned to ARNP LumOr. (TR 404.) She told him she "was doing well with dose increase but now doing worse." *Id.* ARNP LumOr increased the dose of the medication and asked her to return in four to six weeks. (TR 406.)

**October 14, 2011:**  Ms. Ortega completed a "Client Progress Report." (TR 527.)  Despite reporting symptoms of depression, anxiety, anger, and sleeplessness, she indicated her "current state of well being" fell between 80 and 90 with 100 being "best." *Id.*

**October 27, 2011**:  Ms. Ortega asked the Social Security Administration to reconsider its decision to deny her claim for supplemental security income.  Her request was presented to Thomas Clifford, Ph.D., a psychologist.  He agreed with Dr. Kester that Ms. Ortega's claim is not supported by the record.  While acknowledging her impairments limit her ability to work, Dr. Clifford concluded

Order ~ 9

they are not so severe as to "preclude productive activity in a competitive employment situation."  (TR 88.)

**November 4, 2011**:  Ms. Ortega was seen by ARNP Dawn Conquest for shoulder pain.  (TR 435.)  Ms. Ortega did not seek treatment for bipolar disorder, depression, or anxiety.

**November 17, 2011**:  Jan M. Kouzes, Ed.D., evaluated Ms. Ortega at the request of the Washington State Department of Social and Health Services.  (TR 540.)  She confided to him:

> I am a major alcoholic.  If there is any chance that I can get alcohol, I will do it.  From 14 to 16 I smoked marijuana.  I have tried meth and cocaine plus the alcohol. These days I try not to drink because I know I can't quit drinking even if I have a "babysitter" to try to stop me.  I last drank last month.  If I had more money I would purchase more alcohol.  I have never been in treatment because I believe my family can help me with stopping drinking.  I would go to [treatment] if I felt I needed it, but I don't.

(TR 541.)  Dr. Kouzes asked Ms. Ortega whether her mental health problems prevent her from working.  She said, "I just don't see how I can work.  I don't get along with bosses and their stipulations.  I would rather be home where I can do what I want.  I don't think my drinking is a problem with work.  It is more I just quit things."  (TR 542.)  Given Ms. Ortega's response, Dr. Kouzes was pessimistic:

> The client will need strong assistance/motivation to help her break out of her comfort zone.  She does [not plan] to work and does not see a way this

Order ~ 10

could successfully happen.  If she were able to be given job training and placement at a supportive, mentored worksite such as Goodwill or CI [s]he is more likely to be able to make the transition to even [part] time employment.

(TR 542.)

**November 18, 2011**:  Ms. Ortega completed a "Client Progress Report."  (TR 526.)  She again said she was experiencing feelings of depression, anxiety, anger.  However, unlike the previous Report, she also said she was experiencing "[t]houghts of self harm" and "[a]lcohol or substance abuse."  *Id.*

**November 22, 2011**:  Ms. Ortega sought treatment for "sore throat and cough."  (TR 494.)  ARNP Jody Gray noted she was "[a]lert and oriented.  No unusual anxiety or evidence of depression."  (TR 496.)

**February 7, 2012**:  Ms. Ortega sought treatment from ARNP Edward Liu for bipolar disorder.  (TR 483.)  He wrote, "The patient is negative for anhedonia, is not agitated, is not anxious, has normal insight, exhibits normal judgment, has normal attention span and concentration, does not have pressured speech, and does not have suicidal ideation."  (TR 485.)  Although ARNP Liu's note is not entirely clear, it appears Ms. Ortega advised him she (recently?) had had a psychological evaluation at Central Washington Comprehensive Mental Health and had been advised she does not have bipolar.  *Id.*  She told ARNP Liu she

Order ~ 11

wanted to stop taking Lamictal.  He advised her not to do so.  He encouraged her to continue taking the medication until he reviewed the notes from CWCMH.  *Id.*

**March 1, 2012**:  Ms. Ortega returned to ARNP Edward Liu for a follow-up visit.  (TR 479.)  She advised him she had stopped taking Lamictal approximately one week earlier because she was "unable to pick up refills."  (TR 481.)  She denied experiencing depression, *id.*, and she claimed she was "feeling better without medication than she did while she was on medication."  (TR 479.)  ARNP did not observe any symptoms of bipolar disorder.  (TR 481.)

**June of 2012**:  Ms. Ortega moved to the State of West Virginia to live with an aunt.  (TR 47.)  She returned to Yakima, Washington, during June of 2013.  (TR 46.)  She did not take any psychotherapeutic medications during the year she spent in West Virginia, nor did she participate in counseling.  (TR 47-8.)  She became pregnant while living in West Virginia.  She gave birth to a baby girl during the spring of 2013.  (TR 46.)

**June 18, 2013**:  An Administrative Law Judge conducted a hearing with respect to Ms. Ortega's claim for supplemental security income.  Ms. Ortega testified she wants to work, but "sometimes I have the anxiety attacks where I feel like I can't breathe.  I feel like it's tunnel vision.  I don't see anything or hear anything except for what's right in front of me."  (TR 48-49.)  Ms. Ortega said she periodically suffers from "breakdowns."  (TR 50.)  The ALJ asked her what she

Order ~ 12

meant.  She explained, "Kind of like I don't feel like I should exist, why be here?  I don't understand why God put me on earth type of thing."  (TR 50.)  The ALJ asked her whether she is able to go to a store and purchase things her baby needs.  "Sometimes," Ms. Ortega testified.  (TR 52.)  "I like to go at late hours because there's not a lot of people there and when I'm around a crowded place, I get really bad anxiety attacks."  *Id.*  The ALJ asked her whether she is capable of performing household chores.  *Id.*  Ms. Ortega said it's difficult.  She'll begin one task, become distracted by the need to perform a different task, and only later realize she still needs to complete the first task.  (TR. 53.)  Ms. Ortega likes to play computer games.  (TR 57.)  She also likes to read books and magazines, but she has trouble comprehending what's she's reading.  (TR 56-57.)  She suffers from nightmares (TR 54), panic attacks (TR 57), and depression (TR 59.)  On bad days, she is unable to perform even basic personal hygiene (TR 59); she simply lies in bed.  (TR 53.)

**July 26, 2013:**  The Administrative Law Judge issued an unfavorable decision after completing the first four steps of the five-step sequential evaluation process.  20 C.F.R. § 416.920(a)(4).  At Step Two, the ALJ found Ms. Ortega suffers from two severe impairments, viz., attention deficit disorder and affective disorder.  (TR 24.)  At Step Four, the ALJ found Ms. Ortega's impairments are capable of causing the symptoms she described.  (TR 28.)

Order ~ 13

However, the ALJ discounted her description of her symptoms. *Id.*  The ALJ also discounted the assessments of Dr. Qadir, Dr. Kouzes, and Mr. Clark.  (TR 28-30.) The ALJ went on to determine Ms. Ortega is capable of performing her past relevant work as a flagger.  (TR 33.)  A person who is capable of performing her past relevant work is not disabled.  20 C.F.R. § 416.920(a)(4)(iv).  Consequently, the ALJ denied Ms. Ortega's claim for supplemental security income.

**JURISDICTION**

Ms. Ortega asked the Appeals Council to review the ALJ's unfavorable ruling.  On January 13, 2015, the Appeals Council decided not to do so.  At that point, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 416.1484(d).  Ms. Ortega commenced this action on March 11, 2015.  42 U.S.C. § 405(g).  Both she and the Acting Commissioner move for summary judgment.

**STANDARD OF REVIEW**

A district court has "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  However, review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]"  *Id.*  As a result, the Commissioner's decision

Order ~ 14

"will be disturbed only if it is not supported by substantial evidence or it is based on legal error." *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986). "Substantial evidence" means more than a mere scintilla . . . but less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.1988) (internal punctuation and citations omitted).

**VIOLET ORTEGA**

During the administrative hearing, Ms. Ortega testified her mental impairments manifest themselves in various ways. She said she becomes extremely anxious when she is in a "crowded place." (TR 52.) She said she suffers panic attacks (TR 57) and bouts of severe depression. (TR 59.) When the latter occur, said Ms. Ortega, she typically lies in bed all day. (TR 53.) She said psychotherapeutic medications do not relieve her symptoms. (TR 47-48.) She said that as a result of her mental impairments, she finds it difficult to learn (TR 55) and impossible to hold a job. (TR 59-60.)

The Administrative Law Judge was not unsympathetic. She found Ms. Ortega suffers from attention deficit hyperactivity disorder and affective disorder. The ALJ further found Ms. Ortega's impairments reasonably could be expected to cause the types of symptoms she described. (TR 28.) Given those findings, the ALJ was required to evaluate "the intensity, persistence, and functionally limiting effects of the symptoms" in order to determine "the extent

Order ~ 15

to which the symptoms affect [Ms. Ortega's] ability to do basic work activities."
SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996).  "This requires the adjudicator
to make a finding about the credibility of the individual's statements about the
symptom(s) and its functional effects."  *Id.*  In order to assess a claimant's
credibility, the ALJ must carefully examine the record as a whole.  The ALJ must
decide whether the claimant's "statements can be believed and accepted as
true."  SSR 96-7p, 1996 WL 374186, at *4.  An ALJ typically will conduct a wide-
ranging inquiry, employing "ordinary techniques of credibility evaluation[.]
*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.2008) (citation omitted).  If
there is no evidence of malingering on the claimant's part, "the ALJ may reject
the claimant's testimony regarding the severity of her symptoms only if he
makes specific findings stating clear and convincing reasons for doing so."
*Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir.1996).

　　　　Here, the ALJ decided Ms. Ortega's testimony was not entirely credible.
For one thing, the ALJ was concerned she did not disclose to either Dr. Qadir or
Mr. Clark that she has a lengthy history of alcohol abuse and she considers
herself to be "a major alcoholic."  (TR 541.)  For another thing, the ALJ thought
she overstated the impact of her mental impairments.  For example, Ms. Ortega
said she struggles to perform basic personnel hygiene when she is severely
depressed.  (TR 59.)  The ALJ questioned the accuracy of that statement.  As the

ALJ pointed out, Ms. Ortega is the primary caregiver for her infant child, although she receives help from the child's father and others. The ALJ decided Ms. Ortega's ability to function as the primary caregiver for an infant child indicates she is more capable than she is willing to admit. (TR 30.) The ALJ found support for this determination in the reports of health care providers. On a number of occasions, noted the ALJ, they reported she was responding to treatment. Such circumstances persuaded the ALJ that Ms. Ortega tends to exaggerate the impact of her impairments.

Ms. Ortega argues the ALJ lacked an adequate basis for discounting her credibility. To begin with, she argues the ALJ failed to appreciate the episodic nature of her psychological problems. While there may have been periods of time during which her symptoms were controlled by psychotherapeutic medications and counseling, there also were periods during which her symptoms flared up. Such flare-ups were common, says Ms. Ortega. Furthermore, according to Ms. Ortega, the ALJ overstated the efficacy of the medications she took. At best, says Ms. Ortega, they took the edge off of her symptoms. They were never effective enough to enable her to work.

Ms. Ortega has additional criticisms of the ALJ's credibility determination. As will be recalled, the ALJ cited her role as the primary caregiver for her infant child as evidence she is more capable than she indicated during the hearing. In

Order ~ 17

Ms. Ortega's opinion, the ALJ misinterpreted the relevant evidence. Ms. Ortega insists that when she is depressed, she depends heavily upon help from others. Without help, says Ms. Ortega, she would be unable to provide adequate care.

Finally, there is the matter of substance abuse. The ALJ was troubled by Ms. Ortega's failure to inform Dr. Qadir and Mr. Clark of her problems in that regard. Ms. Ortega argues the ALJ's concern about substance abuse is unfounded. According to Ms. Ortega, there is no evidence she was abusing any substance at any time relevant to her claim for supplemental security income. Even if some such evidence existed, says Ms. Ortega, the ALJ failed to establish a causal relationship between substance abuse and her symptoms.

It is useful to begin with Ms. Ortega's self-described alcoholism. Contrary to Ms. Ortega, the ALJ did not attempt attribute her symptoms to her drinking. What was significant to the ALJ was Ms. Ortega's failure to disclose material information to mental health professionals. Ms. Ortega should have been able to appreciate the importance of her abuse of alcohol and drugs, and yet she withheld that information. Not just once, but twice. Her lack of candor is a serious matter. By withholding material information, she potentially undermined the validity of the assessments that were completed by Dr. Qadir and Mr. Clark. Furthermore, even if her omission did not adversely affect their

Order ~ 18

assessments, it certainly undermined her reliability as a reporter, which is no small thing.

When determining whether a claimant's testimony is credible, an Administrative Law Judge reasonably may ask whether the record reflects the claimant is an accurate reporter.  For example, has the claimant been consistent?  Has she been complete?  Are her statements supported by other evidence in the record?  In this instance, the ALJ had reason to be concerned; and not just because of Ms. Ortega's failure to disclose substance abuse to Dr. Qadir and Mr. Clark.  Ms. Ortega's testimony concerning psychotherapeutic medications also generated troubling issues.

As recounted earlier, Ms. Ortega made a fairly sweeping allegation with respect to the efficacy of psychotherapeutic medications.  She insisted her bipolar disorder "overpower[ed]" the medications that had been prescribed by Dr. Qadir.  (TR 47-48.)  The record is otherwise.  Contrary to Ms. Ortega's testimony, there were extended periods of time in which psychotherapeutic medications provided substantial relief.  On July 22, 2010, for example, Dr. Qadir wrote, "[Ms. Ortega] is doing much better with this combination of [medications].  She still has some anger, but it's manageable."  (TR 364.)  Admittedly, there were other times when her therapists had to adjust dosages and prescriptions.  Overall, however, psychotherapeutic medications were

Order ~ 19

reasonably effective when she took them. In the end, it was she who decided to stop. On February 7, 2012, she told ARNP Liu she had been evaluated at Central Washington Comprehensive Mental Health. She said she had been told she does not have bipolar disorder, and she advised ARNP Liu she wanted to stop taking Lamictal. (TR 485.) ARNP Liu examined her, and although he did not observe any symptoms of psychiatric disorder, *id.*, he asked her to continue taking the medication until he could review the records at CWCMH. *Id.* Ms. Ortega returned to ARNP Liu on March 1, 2012. She told him she had ceased taking Lamictal because she was "unable to pick up refills." Furthermore, she denied experiencing depression. (TR 481.) She said "she [was] feeling better without medication than she did while she was on medication. *Id.* Perhaps because she was feeling better, she did not resume taking psychotherapeutic medications. (TR 47-48.) Indeed, by the time she testified at the administrative hearing, she had been off of such medications for over 15 months.

Now, it is important to note the ALJ did not discount Ms. Ortega's credibility because she decided to stop taking psychotherapeutic medications for an extended period of time. Rather, the issue was whether Ms. Ortega accurately described her response to such medications. In that regard, it is useful to contrast what Ms. Ortega could have said at the administrative hearing with what she did say. She could have acknowledged psychotherapeutic medications

Order ~ 20

helped her manage her symptoms.  She did not do that.  Instead, she insisted her bipolar disorder "overpower[ed]" the medications she took.  The ALJ had to assess the credibility of that statement.  In so doing, the ALJ compared Ms. Ortega's testimony at the administrative hearing with comments she made to mental health professionals at various points between 2009 and 2012.  There were material inconsistencies between the two.  *See, e.g.*, TR 386 ("[c]lient reports symptoms are well controlled with medications"); TR 409 ("improved with lamictal 50 mg"); TR 401 ("[p]atient reports that since taking the new medications she is experiencing no symptoms and is not in need of counseling").  The ALJ properly took notice of the inconsistencies in assessing Ms. Ortega's credibility.

Similarly, there is some inconsistency between Ms. Ortega's description of her symptoms and her description of the activities she is capable of performing.  For example, she testified she sometimes is paralyzed by her depression; that on bad days, she doesn't do anything -- not even perform basic hygiene.  (TR 59.)  However, she also acknowledged she cares for her infant child.  Admittedly, this is not an easy task.  She becomes frustrated when her baby cries.  (TR 51.)  She finds it difficult to multi-task.  (TR 53.)  And she needs help.  (TR 51.)  Nevertheless, despite serious challenges, she is the primary caregiver for her

Order ~ 21

child.  The ALJ properly took note of this circumstance.  It suggests she is a stronger person than she acknowledged at the hearing.

One other circumstance must be considered in reviewing the ALJ's decision to discount Ms. Ortega's credibility; namely, the ALJ watched her testify.  The opportunity to study a witness' demeanor as she testifies is a valuable aid in assessing credibility.  It is an advantage a reviewing court must respect.  *Molina v. Astrue*, 674 F.3d 1104, 1121 (9th Cir.2012).  In this case, after watching Ms. Ortega testify, and after evaluating her testimony in light of the record as a whole, the ALJ reasonably discounted her credibility.  The ALJ had a clear and convincing basis for concluding she sometimes omits material information when describing her impairments, just as she sometimes makes sweeping statements about her impairments that are not supported by the record.

**ABDUL QADIR, M.D.**

Ms. Ortega was evaluated by Dr. Qadir on at least four occasions during 2009 and 2010.  The second appointment took place on January 28, 2010, at the request of the Washington State Department of Social and Health Services.  The latter asked Dr. Qadir to complete a two-page form that is entitled "Documentation Request for Medical/Disability Condition."  (TR 531.) The form has eight questions.  Question 1 asks whether the person has a "mental . . . issue[] that require[s] special accommodations or consideration."  *Id.*  Dr. Qadir

Order ~ 22

checked the "yes" box, but he acknowledged his assessment was not "supported by any testing, lab reports, etc." *Id.* Questions 2-5 probe the person's ability to look for work or hold a job. Dr. Qadir checked a series of boxes indicating Ms. Ortega's condition imposes substantial limitations. Question 6 asks, "How long will the person's condition likely limit the ability to work." Dr. Qadir answered the question by circling the following statement, "This is a permanent condition." (TR 532.) However, he inserted the following caveat, "We will reassess in six months if her condition gets better[.]" (TR 532.) The final question on the form is, "Are there specific issues that need further evaluation or assessment?" Dr. Qadir wrote, "I am doing medication changes to control her condition." *Id.*

The ALJ classified Dr. Qadir as a treating physician, which meant she was required to accept his assessment unless she provided "specific and legitimate reasons" that are "supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998). As it turned out, the ALJ gave "little weight" (TR 32) to Dr. Qadir's determination Ms. Ortega suffers from a permanent condition that renders her unable to hold a job. (TR 531-32.) The ALJ gave several reasons for discounting Dr. Qadir's assessment. To begin with, she was troubled by the absence of "objective medical evidence to support [Ms. Ortega's] claims." (TR 31.) Furthermore, Dr. Qadir acknowledged Ms. Ortega is capable of performing at least some of the functions one must be able to perform

Order ~ 23

in order to work.  *Id.*  Finally, the ALJ thought Dr. Qadir's assessment of Ms.

Ortega's functional abilities was "temporary in nature."  (TR 32.)

Ms. Ortega vehemently disagrees with the ALJ's interpretation of Dr.

Qadir's comments.  Ms. Ortega submits the ALJ's interpretation cannot be

reconciled with Dr. Qadir's determination her condition is "a permanent

condition."  Ms. Ortega insists he meant what he said, although she

acknowledges he added a caveat, viz., "We will reassess in six months if her

condition gets better[.]"  (TR 532.)  According to Ms. Ortega, her condition did

not improve.  As authority, she cites several of her subsequent interactions with

mental health professionals and health care providers.  For example, on August

3, 2011, she was examined by ARNP Chet LumOr, who observed "symptoms of a

major depressive episode."  (TR 414.)

Ms. Ortega makes a valid point.  Her symptoms did wax and wane; and at

times, she struggled.  However, the fact she struggled from time to time does not

undermine the ALJ's interpretation of the form Dr. Qadir completed on January

28, 2010.  Despite describing Ms. Ortega's condition as "permanent," he advised

the Washington State Department of Social and Health Services that he was

"doing medication changes to control her condition."  (TR 532).  He recognized

her condition could improve in response to the changes he was making and,

indeed, it did.  Admittedly, progress was not linear.  As she correctly observes,

Order ~ 24

there were setbacks along the way.  But overall, she responded positively to treatment; at least when she followed medical advice.  *See, e.g.*, TR 401.  The ALJ properly considered this circumstance in determining how much weight to give to the statement, "This is a permanent condition."  In view of Ms. Ortega's generally positive response to treatment, the ALJ reasonably declined to give as much weight to Dr. Qadir's assessment of January 28, 2010, as she would have liked.

The ALJ had another concern, *i.e.*, the absence of objective evidence.  As will be recalled, Dr. Qadir conducted psychiatric evaluations on both April 6, 2009 (TR 262) and January 28, 2010 (TR 531).  He did not order diagnostic tests on either occasion.  (TR 263, 531-32.)  Rather, he relied exclusively upon the information she provided to him and his observations of her.  No doubt Dr. Qadir is a perceptive observer, but the fact remains Ms. Ortega withheld material information from him.  Thus, the ALJ properly was troubled by his heavy reliance upon her statements and the absence of any test results confirming his observations.

To summarize, the ALJ reasonably questioned both the validity and reliability of Dr. Qadir's 2010 assessment.  The validity of his assessment was undermined by the fact Ms. Ortega withheld material information from him and by the fact he did not order diagnostic tests.  The reliability of his assessment

Order ~ 25

was undermined by the fact his initial opinion was not confirmed by subsequent

events.  Where, as here, an ALJ identifies evidence that undermines both the

validity and reliability of an expert's opinion, the ALJ has provided a legitimate

basis for discounting the opinion.  Thus, the ALJ did not err in assigning "little

weight" to Dr. Qadir's 2010 assessment.

**CHRIS CLARK**

On May 4, 2011, Ms. Ortega was evaluated by Chris Clark at the request of

the Washington State Department of Social and Health Services.  Mr. Clark

described Ms. Ortega as being "unstable in mood and thought function while

being restablished [sic] on psychiatric medications."  (TR 382.)  He observed

anxiety and depression, which he attributed to Bipolar Disorder, ADHD, and

PTSD.  (TR 380.)  He concluded Ms. Ortega's anxiety and depression would have

a "Marked" impact upon her ability to perform "Work Activities."  *Id.*  Given her

anxiety, he thought she would find it difficult "to focus, concentrate, and

complete tasks in a timely and efficient manner."  *Id.*  Given her depression, he

thought she would experience "suicidal ideation, poor energy, poor sleep, social

isolation, with poor motivation and apathy, especially when not on psychiatric

pharmacotherapy."  *Id.*  He was unsure how long the preceding limitations would

last, but he suspected they would continue for at least six months past the point

at which she reinitiated treatment.  (TR 382.)

Order ~ 26

The ALJ gave "little weight" to Mr. Clark's determination that Ms. Ortega's anxiety and depression would impose marked limitations upon her ability to perform basic work-related activities. (TR 32.) The ALJ cited several reasons for her decision to discount Mr. Clark's opinion in that regard. To begin with, she thought his analysis was internally inconsistent. As the ALJ pointed out, Mr. Clark acknowledged Ms. Ortega experienced only mild limitations with respect to her ability to follow simple instructions, to learn new tasks, to perform routine tasks without undue supervision, and to perform effectively if she had only limited public contact. (TR 381.) If Ms. Ortega experienced only **mild** limitations in those areas, asked the ALJ, how could Mr. Clark justify his conclusion that she experienced **marked** limitations upon her ability to perform basic work-related activities? As far as the ALJ was concerned, Mr. Clark's report did not provide a satisfactory answer.

The existence of internal inconsistency in Mr. Clark's analysis was not the ALJ's only concern. She also questioned whether he had an adequate factual basis for his ultimate conclusions. Several things troubled her. In her opinion, Mr. Clark failed to cite medical evidence in support of his conclusions; relied too heavily upon Ms. Ortega's subjective complaints; and reached conclusions that could not be reconciled with her treatment records. (TR 32.)

Order ~ 27

Ms. Ortega acknowledges Mr. Clark lacks the credentials to qualify as an "acceptable medical source." 20 C.F.R. § 416.913(a) (licensed psychologists are qualified to provide evidence that may be used to establish an impairment). However, Mr. Clark's written evaluation was reviewed by Philip Rodenberger, M.D., a psychiatrist. (TR 383.) Ms. Ortega urges the Court to construe Mr. Clark's evaluation as a collaborative effort involving Dr. Rodenberger. Given the latter's involvement, says Ms. Ortega, Mr. Clark's evaluation should be treated as the assessment of an examining source. If Ms. Ortega is correct, the Court may uphold the ALJ's credibility determination only if she provided clear and convincing reasons for her decision. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1298 (9th Cir.1999).

Ms. Ortega's argument rests upon the assumption Dr. Rodenberger collaborated with Mr. Clark in the preparation of the latter's evaluation. It is true Dr. Rodenberger signed the evaluation as the "Releasing Authority." However, it is unclear what that means. For example, did Dr. Rodenberger interview Ms. Ortega? Did he examine her medical and mental health records? Did he and Mr. Clark engage in a detailed discussion of the latter's findings and conclusions? As the record now stands, it is impossible to answer any of those questions. Consequently, it is impossible to determine whether Dr. Rodenberger collaborated in the preparation of Mr. Clark's evaluation. Absence evidence of

Order ~ 28

meaningful collaboration, one must assume the opinions that are set forth in Mr. Clark's evaluation are his opinions and his alone.  That is to say, they are the opinions of a person who is not an acceptable medical source.  Thus, the ALJ's decision to discount his evaluation is not subject to the "clear and convincing standard."  A germane reason will suffice.  *Molina*, 674 F.3d at 1114.

And such a reason exists.  As explained above, Mr. Clark identified two areas in which Ms. Ortega faced "marked" limitations in her ability to perform normal day-to-day work activities.  He did not think she would be able to work effectively with the public, and he thought her anxiety would make it difficult for her to "maintain appropriate behavior in a work setting."  (TR 381.)  The ALJ incorporated the first limitation (little or no contact with the public) into Ms. Ortega's residual functional capacity.  (TR 26.)  See 20 C.F.R. §§ 416.920(a)(4)(iv), .945.  The other marked limitation involved "anxiety management."  (TR 381.)  Ms. Ortega's medical records suggested this issue could adequately be addressed through therapy.  Thus, the ALJ had a rational basis for concluding Ms. Ortega could manage her symptoms well enough to perform normal day-to-day work activities.

**JAN KOUZES, Ed.D.**

On November 17, 2011, Jan Kouzes, Ed.D., evaluated Ms. Ortega at the request of the Washington State Department of Social and Health Services.  As

part of the process, he completed a "Psychological/Psychiatric Evaluation."  (TR

540.)  He observed symptoms of anxiety, anger, and social withdrawal, *id.*, which

he associated with major depressive disorder, alcohol dependence, and PTSD.

*Id.*  He asked Ms. Ortega to describe the effect her impairments have on her

ability to work.  She responded, "I just don't see how I can work.  I don't get

along with bosses and their stipulations.  I would rather be home where I can do

what I want.  I don't think my drinking is a problem with work.  It is more I just

quit things."  (TR 542.)  Dr. Kouzes did not attempt to quantify Ms. Orega's

"Functional Limitations," *i.e.*, "the degree of limitation that diagnosed conditions

impose on the individual's ability to perform a normal day-to-day work basis. "

Nevertheless, he questioned her ability to work:

> The client will need strong assistance/motivation to help her break out of
> her comfort zone.  She does [not plan] to work and does not see a way this
> could successfully happen.  If she were able to be given job training and
> placement at a supportive, mentored worksite such as Goodwill or CI [s]he
> is more likely to be able to make the transition to even [part] time
> employment.

(TR 542.)

The ALJ was unpersuaded by Dr. Kouzes' assessment.  First, she

questioned whether he had an adequate factual basis for his opinions.  As she

pointed out, he met only once with Ms. Ortega.  (TR 32.)  Second, she was

Order ~ 30

troubled by the fact he failed to list any functional limitations Ms. Ortega experienced as a result of her impairments. *Id.* Third, she thought his assessment was unduly pessimistic given Ms. Ortega's generally positive response to treatment and the activities she is capable of performing. *Id.* Finally, she noted the two experts who reviewed Ms. Ortega's medical records at the request of the SSA -- *i.e.*, Eugue Kester, M.D., and Thomas Clifford, Ph.D. -- reached much more optimistic conclusions. *Id.*

Ms. Ortega objects to the ALJ's decision to discount Dr. Kouzes' assessment. At least one of her objections is familiar. She thinks the ALJ failed to appreciate the episodic nature of her mental health problems. In other words, according to Ms. Ortega, the ALJ mistook temporary periods of remission as progress toward mental health. Ms. Ortega also thinks the ALJ overstated her ability perform the daily activities of living. Ms. Ortega insists she is far more limited than the ALJ claimed. Furthermore, while Ms. Ortega acknowledges Dr. Kouzes did not list specific functional limitations, she insists his position is clear; namely, that her impairments prevent her from working. Finally, there is the matter of the ALJ's reliance upon Drs. Kester and Clifford. As Ms. Ortega notes, neither expert examined her. To her way of thinking, their opinions should be afforded less weight than Dr. Kouzes', not more.

The defendant urges the Court to overrule Ms. Ortega's objections. According to the defendant, Dr. Kouzes' failure to identify functional limitations is a more serious problem than Ms. Ortega is willing to admit.  The defendant's point is well taken.  An SSI applicant must submit evidence from "an acceptable medical source" in order to establish the existence of a "medically determinable impairment."  20 C.F.R. § 416.913(a).  A licensed psychologist is one such source.  20 C.F.R. § 416.913(a)(2).  However, a report from a psychologist -- or any other acceptable medical source, for that matter -- should include a number of types of information.  20 C.F.R. § 416.913(b).  One of them is an assessment of what the SSI applicant can do despite her impairments.  20 C.F.R. § 416.913(b)(6).  Dr. Kouzes' evaluation did not include this important piece of information.  As the defendant points out, an ALJ may discount an expert opinion which does not "show how [a claimant's] symptoms translate into specific functional deficits which preclude work activity."  *Morgan v. Comm'r*, 169 F.3d 595, 601 (9th Cir. 1999).  Thus, the ALJ properly took note of Dr. Kouzes' failure to include functional limitations in his report.

The ALJ's decision to discount Dr. Kouzes' assessment was reinforced by two other considerations.  One was Ms. Ortega's generally favorable response to treatment.  While she protests she did not respond as well as the ALJ thought, and while there is some support for her position, an objective ALJ would not be

Order ~ 32

compelled to agree with her.  Looking at the record as a whole, an objective ALJ reasonably could conclude Ms. Ortega generally responded well to treatment; so much so that Dr. Kouzes should have given more weight to this circumstance.

Finally, there is the matter of the ALJ's reliance upon the opinions of two non-examining experts.  Ms. Ortega correctly notes that an ALJ may not discount an examining expert's opinion based solely upon a contrary opinion from a non-examining expert.  *See, e.g., Morgan*, 169 F.3d at 602.  However, that does not mean the non-examining expert's opinion is irrelevant.  To the contrary, the ALJ may consider the non-examining expert's opinion in conjunction with other evidence, which is what occurred in this case.  The opinions of Drs. Kester and Clifford were but one factor in the ALJ's analysis, and a secondary one at that.  Of greater importance to the ALJ were Dr. Kouzes' failure to set forth functional limitations in his report and his failure to give more weight to the effectiveness of treatment.

**CONCLUSION**

A reviewing court should not substitute its assessment of the evidence for the ALJ's.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir.1999).  To the contrary, a reviewing court must defer to an ALJ's assessment as long as it is supported by substantial evidence.  42 U.S.C. § 405(g).  Here, the ALJ's written opinion indicates she engaged in a careful review of the evidence.  She provided clear

Order ~ 33

and convincing reasons for discounting the testimony of Ms. Ortega; so, too, the opinions of Dr. Qatir, Mr. Clark and Dr. Kouzes.  Since the ALJ's analysis and conclusions are supported by substantial evidence, the Court will affirm her ruling.

**IT IS HEREBY ORDERED**:

1.  The plaintiff's summary judgment motion (**ECF No. 13**) is **denied**.

2. The defendant's summary judgment motion (**ECF No. 18**) is **granted**.

3. The decision of the Administrative Law Judge (TR 34) is affirmed.

**IT IS SO ORDERED**.  The District Court Executive is hereby directed to file this order, furnish copies to counsel, and close the case.

**DATED** this 12th day of October, 2016.


s/Fred Van Sickle
FRED VAN SICKLE
Senior United States District Judge